**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CYRILENE EASTMOND** | : | |
| | : | **CIVIL ACTION** |
| v. | : | **No. 21-5280** |
| | : | |
| **YELENA GALKIN and** | : | |
| **CITY OF PHILADELPHIA** | : | |

---

**McHUGH, J.**                                                    **February 2, 2024**

<u>**MEMORANDUM**</u>

This is an employment action alleging discrimination and violation of the Family and Medical Leave Act (FMLA). Plaintiff Dr. Cyrilene Eastmond was formerly employed by the City of Philadelphia's Department of Public Health, under the supervision of Dr. Yelena Galkin. Plaintiff took FMLA leave, and Defendants reassigned her to a new position when she returned. Dr. Eastmond alleges this reassignment violates the FMLA, and further violated the Age Discrimination in Employment Act (ADEA), the Americans with Disabilities Act (ADA), and the Pennsylvania Human Relations Act (PHRA). Defendants now move for summary judgment on all counts, and Plaintiff cross-moves for summary judgment as to violation of the FMLA. I will grant Defendants' motion as to all claims except the FMLA interference claim, and deny Plaintiff's motion, leaving the FMLA interference claim for resolution by a jury.

## I.      Factual Background

Dr. Eastmond worked for the City of Philadelphia's Department of Public Health from May 2000 until June 2020, when she was age 66. Eastmond Dep. 9:21-10:10, ECF 22-2; Eastmond Emp. Rec., ECF 22-1; Pl.'s Opp. Br. 2, ECF 29. From 2007[1] until 2020, she served as Medical

---

[1] In her deposition, Dr. Eastmond stated she became Medical Clinical Director in 2006, but her employment record indicates she began this position in January 2007.

Clinical Director of Health Center #9.  Eastmond Dep. 10:17-11:5; Eastmond Emp. Rec.  Dr. Eastmond resigned in June 2020, Eastmond Dep. 43:02-11, and the following facts precipitated her resignation and this lawsuit.

In Fall 2019, Dr. Eastmond alleges that her supervisor, Dr. Galkin, asked her about when she planned to retire in a supervisory meeting.  Eastmond Dep. 15:03-11.  Dr. Eastmond testified that she told Dr. Galkin, "I don't plan to retire any time soon.  My son's in college."  *Id.* at 15:13-14.  To which, Dr. Galkin allegedly replied, "Well, let's hope he just gets a scholarship."  *Id.* at 15:21.  According to Dr. Eastmond, no reference was made to her age and nothing further was said on the subject.  *Id.* at 15:23-16:09.  Dr. Galkin, it should be noted,  denies that this conversation ever happened.  Galkin Dep. 37:01-22, ECF 23-2.

In March 2020, Dr. Eastmond took FMLA leave to care for her sick mother.  Eastmond Dep. 16:22-17:11; FMLA Req., ECF 22-4.  Her mother passed away approximately four weeks later, at which point Dr. Eastmond requested FMLA leave for herself, due to grief, from April 2020 through June 2020.  Eastmond Dep. 17:12-18:12; FMLA Req.  Outside of submitting her FMLA request, Dr. Eastmond did not share with anyone that she was experiencing ongoing grief and depression.  Eastmond Dep. 47:03-24.  Her request was granted, and no one from the City discouraged or sought to prevent Dr. Eastmond from taking either leave.  *Id.* at 18:13-19.  Dr. Eastmond's role was covered by Dr. Barbara Westerhaus, a younger doctor recruited from her role as a Physician to fill in as acting Medical Clinical Director of Health Center #9.  Westerhaus Dep. 12:17-23, 13:14-18, ECF 29-5.

When Dr. Eastmond returned to work on June 9, 2020, she was told to report to a meeting with Defendant Dr. Galkin and the Medical Clinical Director of Health Center #5.  Eastmond Dep. 20:04-14; Galkin Dep. 87:21-88:20.  At this meeting, they discussed COVID-19 and the changes

made as a result, while Dr. Eastmond was on leave.  Eastmond Dep. 20:17-21:06; Galkin Dep. 88:08-15.  They also informed Dr. Eastmond that they wanted her to take a new position as Clinical Director of Special Projects.  Eastmond Dep. 21:01-06; Galkin Dep. 88:08-11.  The job responsibilities for the Special Projects role included "day-to-day coordination and efficient operation of Special Health Care programs," overseeing "COVID testing sites and ensur[ing] timely and efficient test results delivery," and serving as the "liaison to the Mayor's Office of Disabilities to ensure members of the community receive appropriate resources to maintain activities of daily living," among other responsibilities.  Clinical Director Special Projects Job Description, ECF 22-6.  Although the parties agree that the new position had the same title, salary, pension, health insurance, and other benefits as her prior role, *see* Eastmond Dep. 31:11-24 & Galkin Dep. 55:13-15, the parties disagree over whether the Special Projects position was a new position requiring added work and training or essentially the same position requiring the same amount of work and training.  *Compare* Eastmond Dep. 22:05-24:02, 25:08-14, *with* Galkin Dep. 94:11-23, 97:01-105:05.  The parties also disagree over whether Dr. Eastmond expressed dissatisfaction with the reassignment at this meeting.  *Compare* Galkin Dep. 79:12-13 ("[S]he never told me she doesn't want to take this job."), *with* Eastmond Dep. 24:12-14 ("I said to [Dr. Galkin]: I'm really not interested in doing this job.  I'm not interested in taking on this position.").  But Plaintiff concedes that the meeting ended inconclusively:

> **Q:** What happened after you expressed this displeasure with the move to Dr. Galkin?
>
> **A:** She indicated that we would -- she finished her presentation.  And then told me -- actually, after she said that, you know, Darnell is going to take you on a tour for Health Center 5 yada-yada-yada.  And she said -- at the end of the meeting when he left, she actually said: You're a good doctor.  And I just said: Thank you.  And then she says, you know: We'll get back.  We'll have Angela, which is the secretary, set up a meeting and we'll talk later, so forth, so forth and so on.

Eastmond Dep. 37:09-21.

After the reassignment meeting, Dr. Eastmond contacted the Human Resources department due to concerns about the new role. The Human Resources representative, Alicia Wright-Lewis, informed Dr. Eastmond that if she did not accept the reassignment, it could give the appearance of insubordination, so she should speak with her supervisors about her concerns. Eastmond Dep. 40:20-41:16; Wright-Lewis Dep. 84:05-11, ECF 29-3. Ms. Wright-Lewis also informed Dr. Eastmond of an audit process to assess if her prior role and the proposed reassignment were truly equivalent. Wright-Lewis Dep. 78:05-79:17; Eastmond Dep. 35:19-24. Dr. Eastmond did not, however, file the forms to request an audit, Eastmond Dep. 36:09-18, nor did she speak further with Dr. Galkin or anyone else in Human Resources about her displeasure with the new role. *Id.* at 37:02-07.

On June 12, 2020, the Friday after the first conversation about her reassignment, Dr. Eastmond received an email confirming her new role and indicating that she should report to her new work location on Monday. *Id*. at 42:11-16. The next day, on June 13, Dr. Eastmond drafted her letter of resignation, which she submitted on Sunday, June 14. *Id.* at 43:02-11.

Dr. Eastmond then filed this case, alleging an FMLA violation for interference, constructive discharge, and retaliation. Compl. Counts I & II, ¶¶ 44-62, ECF 1. She also alleges that Defendants violated the ADEA and ADA by impermissibly discriminating against her due to her age and her disability (anxiety and depression) when they failed to reinstate her to her former position after her leave. Compl. Counts III-V, ¶¶ 63-83. Finally, Dr. Eastmond alleges violations of the PHRA for disability discrimination. Compl. Counts VI & VII, ¶¶ 84-96. Defendants now move for summary judgment on all counts, and Plaintiff moves for summary judgment only on her FMLA interference claim.

## II.     Legal Standard

Both motions are governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as described by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III.    Discussion

### a.  *FMLA Claims*

Congress passed the FMLA to "balance the demands of the workplace with the needs of families," and "to entitle employees to take reasonable leave for medical reasons."  29 U.S.C. §§ 2601(b)(1)-(2).  The statute "requires certain employers to provide their employees with up to twelve weeks of leave in the event that the employee has a serious medical condition." *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 251 (3d Cir. 2014) (citations omitted); *see also Haybarger v. Lawrence Cnty. Adult Prob. & Parole,* 667 F.3d 408, 415 (3d Cir. 2012) ("[A]n individual supervisor working for an employer may be liable as an employer under the FMLA."). After returning from FMLA leave, "the employer must restore the employee to the same or equivalent position . . . with equivalent benefits and with conditions of employment comparable to those [s]he had when [s]he left." *Ross v. Gilhuly*, 755 F.3d 185, 191 (3d Cir. 2014) (citing 29 U.S.C. § 2614(a)).

Dr. Eastmond claims that by reassigning her to a new role after she returned from her FMLA leave, Defendants interfered with her rights to FMLA leave and retaliated against her for taking the leave.

### i.    FMLA Interference Claim

To make a claim of interference under the FMLA, a plaintiff must establish that:

(1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to

5

FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA.

*Ross*, 755 F.3d at 191-92.  An FMLA interference claim is not about discrimination, "it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." *Callison v. City of Phila.*, 430 F.3d 117, 120 (3d Cir. 2005).

Here, the parties only dispute the fifth factor, whether Dr. Eastmond was denied benefits to which she was entitled under the FMLA because she was given a job reassignment upon her return.  The parties disagree over whether the reassignment satisfied the FMLA's requirement that an "employer must restore the employee to the same or equivalent position" upon their return from FMLA leave.  *Ross*, 755 F.3d at 191.  An "equivalent position . . . must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority."  29 C.F.R. § 825.215(a).  Plaintiff argues that the reassignment entailed many new duties and responsibilities, such as reporting to the mayor's office, overseeing multiple Health Centers instead of just one, and a greater focus on COVID-19 and contact tracing.  Pl.'s Mot. Summ. J. 17-18, ECF 23.  Defendants respond that "the position Plaintiff held before she took FMLA leave had morphed because of the pandemic so it was no longer possible to return her to the same job that she held before her FMLA leave."  Defs.' Mot. Summ. J. 24, ECF 22.  As a result, Defendants argue that there was no equivalent position for Dr. Eastmond to return to and that the reassignment included the same pay, hours, and benefits as before, and would involve the same level of training as restarting at her prior role because of the new pandemic policies.  *Id.*

Based on my review of the record, I find genuine factual disputes, with the result that neither party is entitled to summary judgment on the FMLA interference claim.

ii.    FMLA Retaliation Claim

To succeed on her FMLA retaliation claim, Dr. Eastmond must prove that: "(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012).  Because FMLA retaliation claims require proof of retaliatory intent, "courts have assessed these claims through the lens of employment discrimination law" in cases based on circumstantial evidence,  as is the case here.[2]  *Id.*  Under the framework of *McDonnell Douglas* 411 U.S. 792 (1973), Dr. Eastmond must first establish a *prima facie* case of FMLA retaliation, by pointing to evidence sufficient to create a genuine issue of material fact about each of the three elements of the retaliation claim.  *Id.*  If Dr. Eastmond meets this burden, then Defendants must provide "some legitimate, non-discriminatory reason for [their] decision." *Id.* (citations omitted).  Finally, Dr. Eastmond must then point to evidence on which a factfinder could reasonably disbelieve the articulated legitimate reason.  *Id.*

Dr. Eastmond does not establish a *prima facie* case of FMLA retaliation and thus her claim fails as a matter of law.  It is undisputed that she invoked her right to FMLA-qualifying leave.  But

---

[2] Plaintiff argues that her FMLA retaliation claim is based on direct evidence, and thus should be evaluated under the mixed-motive framework in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 276-77 (1989).  The evidence Plaintiff points to is Defendants' response to Plaintiff's Interrogatories #8, stating that "Defendant did not reinstate Plaintiff to the Clinical Director of Health Center #9 position because the position had been filled," ECF 23-5, and deposition testimony describing how Dr. Westerhaus was chosen as acting clinical director while Dr. Eastmond was on leave.  Pl.'s Opp. Br. 36.  But statements made after the fact do not count.  "To qualify as direct evidence, the evidence must be such that it demonstrates that the decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision. . . . Specifically, any statements made by a defendant's employees must be made at a time proximate to the challenged decision . . ." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 269 (3d Cir. 2010) (internal quotations omitted).  The response to the interrogatory does not qualify as direct evidence, especially since it was clarified in deposition testimony.  Moreover, the deposition testimony Plaintiff cites to as direct evidence, contrary to Plaintiff's assertions, clearly states that Dr. Westerhaus was hired *temporarily* while Plaintiff was on leave – not to fill her position such that she could not return.  *See* Galkin Dep. 48:05-50:12 ("It's not accurate that Plaintiff cannot return because [the] position was filled.").  I will therefore proceed under the *McDonnell Douglas* burden-shifting framework for circumstantial evidence.

no reasonable jury could find that Dr. Eastmond's reassignment was an adverse employment action as defined by case law.   An adverse employment action is "one which is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001) (citations omitted); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (describing the standard for an adverse employment action as an objective one); *Hartman v. Select Rehab., LLC,* 528 F. Supp. 3d 373, 383 (E.D. Pa. 2021) (Savage, J.) ("[L]ateral transfers or changes in title absent evidence of a *material* change in an employee's working conditions generally do not constitute adverse employment actions.") (emphasis added) (citations omitted).[3]

Plaintiff argues that this is an objectively adverse employment action because a reasonable person in her 60s would be "dissuaded from seeking an FMLA leave" if upon returning she would have to do an "entirely new job with new job responsibilities."   Pl.'s Opp. Br. 34.   But this mischaracterizes the record.   The parties agree that the reassignment had the same title, salary, pension, health insurance, and other benefits as the prior role.   Eastmond Dep. 31:11-24 & Galkin Dep. 55:13-15.   The new position also required the same number of hours as Dr. Eastmond's prior role.   *See* Clinical Director Special Projects Job Description (listing the job as part-time).   Although the parties dispute how similar the two positions are, to the extent the two roles are different, in

---

[3] In her Complaint, Plaintiff alleges that she suffered an adverse employment action because she was constructively discharged.   Compl. Counts I-IV, VI.   Whether a person is constructively discharged is also an objective test: "whether the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign."   *Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993) (citations omitted).   In most cases, "a prerequisite to a successful constructive discharge claim is that the plaintiff attempted to explore alternatives before electing to resign."   *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 975 (3d Cir. 1998).   Here, Plaintiff admits that she did not tell anyone that she would resign if required to accept the reassignment.   Eastmond Dep. 37:02-06, 39:23-40:03, 42:11-19.   The only action Dr. Eastmond took was to speak with Human Resources about whether the new job was equivalent to the other job, but when offered an audit process she did not pursue it.   *Id.* at 35:19-24, 36:09-18.   The facts here fall far short of a constructive discharge.

objective terms the Special Projects Medical Director position is more prestigious by virtue of the Director's role in overseeing multiple health centers' COVID-19 operations and interfacing with the mayor's office.   Certainly, the reassignment is not "detrimental or undesirable in some objective way," especially because the pay, level, and hours remained consistent.  *Daniels v. Sch. Dist. of Phila.*, 982 F. Supp. 2d 462, 479 (E.D. Pa. 2013) (Bartle, J.), *aff'd*, 776 F.3d 181 (3d Cir. 2015).[4]

I recognize some intellectual tension arising from dismissal of the FMLA retaliation claim while allowing the interference claim to proceed.  But the controlling standards, especially as developed through case law, are different.  The FMLA creates an affirmative right to an equivalent position.  *Ross,* 755 F.3d at 191 (citing 29 U.S.C. § 2614(a)).  A retaliation claim requires proof that the position offered upon return differs so significantly that it demonstrates retaliatory animus.  *Lichtenstein*, 691 F.3d at 302.  The record here – albeit marginally – might suffice to prove that the position offered to Dr. Eastmond was not equivalent, but it cannot reasonably be characterized as an adverse action by the City.

Because a jury could not reasonably find that Dr. Eastmond suffered an adverse employment action, her FMLA retaliation claim must fail.

b.  *ADEA Claim*

In Count III of the Complaint, Plaintiff seeks recovery for age discrimination under the ADEA.  29 U.S.C. § 623(a)(1).

---

[4] Plaintiff also argues that a reasonable person in her 60s who is "at significant risk of death from COVID-19 in the early days of the pandemic before there were vaccines available" would find the reassignment adverse because she would be transferred to a facility with COVID-19 testing and responsible for overseeing staff conducting this testing.  Pl.'s Opp. Br. 34.  Yet, Dr. Eastmond testified that she never voiced these concerns directly to her supervisor, Eastmond Dep. 26:05-11, and Dr. Galkin testified that there would be "no physical interactions between her and potential COVID-infectious patients" because she would not have to "physically go to any of those clinics" and the testing site at the clinic her office would be located was in a separate annex.  Galkin Dep. 84:15-85:23.

A plaintiff bringing an age discrimination claim "must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009). Plaintiff presents no direct evidence of age discrimination, such as a clear statement from her employer admitting the discrimination or a company policy that is discriminatory on its face. *See Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996) (describing that it is rare to have direct evidence of discrimination and providing examples); *see also Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 513 (3d Cir. 2004) (concluding that a supervisor inquiring about retirement plans of an employee does not constitute as direct evidence of age discrimination). As such, the *McDonnell Douglas* framework once again applies, requiring that (i) Plaintiff establish a *prima facie* case of age discrimination; (ii) if she does so, Defendants must rebut that presumption by providing a legitimate, non-discriminatory reason for reassigning her; and if Defendants succeed, (iii) it becomes Plaintiff's burden to demonstrate that those reasons are pre-textual to survive summary judgment. 411 U.S. at 802-03.

Once again, Plaintiff fails to establish a *prima facie* case. Dr. Eastmond must show that (1) she is over the age of 40, (2) qualified for the position she held, (3) suffered an adverse employment action, and (4) the adverse action took place under conditions giving rise to an inference of discrimination. *Martinez v. UPMC Susquehanna*, 986 F.3d 261, 266 (3d Cir. 2021).

It is undisputed that Dr. Eastmond is over the age of 40 and qualified for the position that she held. But, as discussed above, Dr. Eastmond did not suffer an adverse employment action. And even assuming Dr. Eastmond's reassignment was an adverse employment decision, she cannot satisfy the fourth element, that the adverse action took place under conditions giving rise to an inference of discrimination. "Where the plaintiff is not directly replaced, the fourth element

is satisfied if the plaintiff can provide facts which if otherwise unexplained, are more likely than not based on the consideration of impermissible factors."  *Willis v. UPMC Child.'s Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015) (citations omitted).  Dr. Eastmond was not fired nor simply replaced by a younger employee.  She was reassigned to a job, which by her account offered more responsibility.  The younger employee, Dr. Westerhaus, served as acting Medical Clinical Director of Health Center #9 in Dr. Eastmond's absence and did not get an offer for that position to be permanent until several weeks after Dr. Eastmond's return and reassignment, and after she had stepped down as acting Director.  Eastmond Dep. 52:24-53:17; Westerhaus Dep. 12:12-23, 16:12-23, 19:23-22:01.

Moreover, the only other evidence of age discrimination is based on Dr. Galkin asking Dr. Eastmond about her retirement plan, along with an alleged retort that she hopes Dr. Eastmond's son gets a scholarship.  Eastmond Dep. 15:12-16:09.  Even taking Dr. Eastmond's account of the facts as true, this is still insufficient evidence to support an inference of age discrimination.  A supervisor inquiring about retirement plans is not evidence of age discrimination absent other evidence to substantiate that claim, even at the *prima facie* level.  *Glanzman*, 391 F.3d at 513.  The record strongly suggests that the City valued Dr. Eastmond's contributions and sought to retain her.

No reasonable jury could find an inference of discrimination based upon age, so her ADEA claims must also fail as a matter of law.

*c.  ADA Claims*

In Counts IV and V of the Complaint, Plaintiff seeks recovery for discrimination under the ADA.  The ADA prohibits discrimination "on the basis of disability in regard to . . . terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).

i.      ADA Discrimination Claim

Dr. Eastmond claims that Defendants violated her rights under the ADA by "wrongfully demoting and constructively discharging Plaintiff because she requested reasonable accommodation for her disabilities," which included "anxiety and depression."  Compl. ¶¶ 74, 76. Plaintiff's ADA claims are again analyzed under the *McDonnell Douglas* burden-shifting framework.  To establish a *prima facie* case of disability discrimination, Dr. Eastmond must show "(1) that [s]he is disabled within the meaning of the ADA, (2) that [s]he is otherwise qualified for the job, with or without reasonable accommodations, and (3) that [s]he was subjected to an adverse employment decision as a result of the discrimination."  *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010).

The parties dispute whether Plaintiff is disabled within the meaning of the ADA, specifically whether her anxiety and depression continued after her FMLA leave such that her disability was ongoing.  Defs.' Mot. Summ. J. 20; Pl.'s Opp. Br. 45.  The ADA defines disability as "a physical or mental impairment that substantially limits one or more major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1).  Regardless, "to establish discrimination because of a disability, an employer must *know* of the disability."  *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 380 (3d Cir. 2002) (emphasis added).  This follows from the language of the statute, which defines unlawful discrimination by an employer as "not making reasonable accommodations to the *known* physical or mental limitations of an otherwise qualified individual with a disability . . ." 42 U.S.C. § 12112(b)(5)(A) (emphasis added).

Plaintiff argues Defendants "would have known that she was medically incapacitated" because Dr. Galkin signed her FMLA paperwork to take leave due to her grief from her mother's

death.  Pl.'s Opp. Br. 46.  But it is undisputed that Dr. Eastmond did not notify Defendants about any ongoing anxiety or depression upon returning from FMLA leave.  Nor did she request any specific accommodation upon return.  Dr. Eastmond testified extensively to this point.  *See* Eastmond Dep. 46:22-49:12. To the extent that Plaintiff's position implies that any request for leave necessarily suggests the need for an accommodation upon return, I can discern no legal support for such a proposition.  And, as discussed above, even if the City could be deemed to have notice of the disability she asserts, she did not suffer an adverse employment action.  I will therefore grant Defendants' Motion for Summary Judgment as to the ADA discrimination claim.

  ii.  ADA Retaliation Claim

Dr. Eastmond also asserts a retaliation claim under the ADA.  "Prohibited discrimination under the ADA includes retaliation against an employee for requesting an accommodation." *Sulima*, 602 F. 3d at 188.  In her Complaint, Dr. Eastmond alleges that "Defendants wrongfully demoted and constructively discharged Plaintiff because Plaintiff requested accommodations for her disabilities."  Compl. ¶ 81.  To succeed on such a claim, an employee need not prove disability. *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 188 (3d Cir. 2003).  This is so because the ADA unambiguously protects "any individual" who has raised an issue under the ADA.  42 U.S.C. § 12203(a) ("No person shall discriminate against *any individual* because such individual has opposed any act or practice made unlawful by this chapter . . . .") (emphasis added).

The *McDonnell Douglas* burden-shifting framework applies once again.  *Shellenberger*, 318 F.3d at 187.  This claim suffers from multiple deficits.  As set forth above, there is no evidence that Dr. Eastmond requested any accommodation; she was not constructively discharged; and although her new position may have been different, by any objective measure it cannot be

considered a demotion.  Summary judgment is therefore warranted as to her ADA retaliation claim, as well.

    *d.  PHRA Claims*

    Plaintiff has also filed closely related claims of disability discrimination and retaliation under the Pennsylvania Human Relations Act ("PHRA").  "The PHRA is basically the same as the ADA in relevant respects 'and Pennsylvania courts [] generally interpret the PHRA in accord with its federal counterparts.'"  *Rinehimer*, 292 F.3d at 382 (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)).  The resolution of Plaintiff's ADA claims therefore also disposes of her PHRA claims.  As such, I will also grant Defendants' Motion for Summary Judgment as to Plaintiff's PHRA claims.

## IV.    Conclusion

    For the reasons set forth above, Defendants' Motion for Summary Judgment is granted as to all counts except the FMLA interference claim.  Plaintiff's Motion for Partial Summary Judgment is denied.  An appropriate order follows.

                /s/ Gerald Austin McHugh
                United States District Judge